UNITED STATES, Appellee

v

AUGUSTINE E. B. JOHNSON, Private First Class,
U. S. Marine Corps, Appellant

20 USCMA 320, 43 CMR 160

No. 23,236

February 5, 1971

Lieutenant Arthur H. Rainey, JAGC, USNR, argued the cause for
Appellant, Accused. With him on the brief were Captain R. O. Kellam,
JAGC, USN, and Commander E. M. Fulton, Jr., JAGC, USN.

Captain John J. Reilly, USMCR, argued the cause for Appellee, United
States. With him on the brief was Lieutenant Colonel Charles J. Keever,
USMC.

## Opinion

FERGUSON, Judge:

The accused was convicted of two specifications of absence without leave (Charge I and Additional Charge II),[1] and one specification each of escape from lawful confinement (Additional Charge I), and attempting, "without proper authority, knowingly to hold intercourse with the enemy . . . with intent . . . [to] discuss peace and moral responsibilities" (Charge II), in violation of Articles 86, 95, and 80, Uniform Code of Military Justice, 10 USC §§ 886, 895, and 880, respectively. His sentence, as approved, extends to a bad-conduct discharge, total forfeitures for one year, confinement at hard labor for one year, and reduction to pay grade E-1. We granted review to consider appellate defense counsel's assertion that Prosecution Exhibits 3 and 14 (pretrial statements of the accused) were improperly admitted in evidence and that the evidence was insufficient to establish the accused's guilt of attempted intercourse with the enemy without proper authority.

While on duty with the Marine Corps in Vietnam, the accused proceeded to Bangkok, Thailand, on authorized rest and recreation leave. When he did not return at its expiration, he was listed as being absent without leave. He was apprehended by border guards in Laos and eventually released to the custody of Agent Baker, Naval Intelligence Service, who returned him to Saigon. While in Baker's custody, the accused was interrogated and the questioning resulted in a statement admitted in evidence as Prosecution Exhibit 3. In his statement, the accused described in detail his whereabouts during his unauthorized absence and acknowledged that he intended to travel across Thailand and Laos and into Vietnam with the intent to contact the Viet

Cong or North Vietnamese regulars and talk with them "of certain moral responsibilities: (1) Duties to God; (2) duties to fellow man. In other words, I feel that it is the responsibility of all men to go out and make peace regardless of what sacrifices they may have to make and it is for this reason that I decided to go out and attempt to meet with the enemy and teach him something of Christianity and of moral responsibilities." While awaiting trial the accused was confined in the brig at Da Nang, Vietnam. He escaped from the brig and again absented himself without authority. He was apprehended while still in Vietnam. After his return to the brig he was interviewed by Agent Beattie. In the statement taken by Beattie (Prosecution Exhibit 14), the accused detailed what occurred during his second absence, commencing with his escape, and his desire once more to contact the North Vietnamese in his crusade for peace and morality among the enemy. He was apprehended before he could begin his mission.

Counsel for the accused contend that the statement to Agent Baker (Prosecution Exhibit 3) was inadmissible on the ground that Baker had advised the accused only that he was suspected of desertion and not that he was also suspected of unlawfully attempting to hold intercourse with the enemy, despite the fact that at that time Baker was aware of the accused's intentions in regard to the latter offense. According to counsel, Prosecution Exhibit 14 was also inadmissible because Agent Beattie interviewed the accused without first notifying counsel who had been assigned to defend Johnson, although he, Beattie, admittedly was aware of counsel's appointment.

The record of trial clearly reflects that Agent Baker was aware of facts sufficient to cause one familiar with the Code to suspect the accused of a violation of, or an attempt to violate,

---

[1] The two offenses were charged as desertion.

**321**

Article 104, Code, supra, 10 USC § 904.[2]

Agent Baker testified, in an out-of-court hearing, that he was ordered to Bangkok to investigate Johnson. When asked to relate what information he possessed in the case at that time, he replied:

". . . A message came in from our office in Birmingham to the fact that they had been contacted by JOHNSON's parents and they had received a letter from him in Danang. In this letter, he had allegedly told them that he was going to Bangkok on R & R and while there, he had decided that he was going to leave Bangkok and did not intend to return and was going to attempt to reach the Viet Cong and the North Vietnamese for the purpose of speaking peace. . .

"REP: I am sorry. I cannot hear the witness. Would he speak up please?

"A. And so, based on that, my office, of course is always looking for Navy personnel who might be attempting to defect or desert, and based on the information that came from our office in Birmingham, they thought that possibly JOHNSON was attempting to do this and therefore they dispatched me to Bangkok to possibly apprehend him and coordinate other efforts to agencies in Bangkok to stop him.

"Q. So, in short, you had an idea that JOHNSON was going to try and contact the enemy. Is that right?
"A. Yes, I did.

"Q. Did you have an opinion at that time that he was going to try to defect?
"A. Yes, I would say that I had that opinion.

"Q. This is when you left Saigon for Bangkok to pick up JOHNSON, is that correct?
"A. Yes, it is.

"Q. Now prior to taking this statement, and prior to actually begin talking to JOHNSON, what offense did you advise him that he was being charged with and what offense you were investigating?
"A. The only offense that I told him that he was alleged to have committed was desertion.

"Q. At that time, did you tell him that you was investigating the possibility of his defecting?
"A. No, I did not.

"Q. Did you tell him that you were investigating the possibility of his attempting to hold intercourse with the enemy?
"A. No. Only desertion.

"Q. Did you suspect that he might be defecting?
"A. I suspected that he might.

"DC: I have no further questions."

On cross-examination, Baker denied any familiarity with Article 104 of the Code and contended that the first time he heard of such a charge was after his investigation was completed.

When questioned by the law officer relative to instructions he received from his superiors as to "what possible offenses might be involved," Baker testified:

"A. I was contemplating warning him for defection, but my superior advised me that defection was not, in the Navy, is not considered an offense. Therefore. . .

"LO: Wait a minute, will both counsel just sit down please. You were going to warn him. . .

[2] "§ 904. Art. 104. Aiding the enemy.
"Any person who—
(1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other things; or
(2) without proper authority, knowingly harbors or protects or gives intelligence to, or communicates or corresponds with or holds any intercourse with the enemy, either directly or indirectly;
shall suffer death or such other punishment as a court-martial or military commission may direct."

"A. I was going to warn him of desertion and defection, and my supervising agent . . . I ask my supervisor what I should warn him about and he said don't warn him for defection, because in the Navy Regulations that is not an offense. It puzzled me, because I was in the Army, and it was my understanding from the Army that it was against military regulations."

Baker acknowledged that he had studied the Uniform Code "but not in any great detail." He admitted that he had discussed no other possible offenses with the accused, "[j]ust desertion."

Defense counsel objected to the admissibility of Prosecution Exhibit 3, citing United States v Reynolds, 16 USCMA 403, 37 CMR 23 (1966), on the ground that the accused was not fully warned of all of the offenses of which he was suspected. The law officer overruled the objection because he believed that Agent Baker acted in good faith and was not in fact aware of the offense of attempted intercourse with the enemy. At the same time, the law officer stated, "I am also of the opinion that when you warn a man of desertion is not to warn him of the intent to have intercourse or attempted intercourse with the enemy."

The Court of Military Review, while agreeing with appellate defense counsel at that level that Agent Baker possessed sufficient facts to suspect the accused of attempted defection or attempted intercourse with the enemy, adopted the reasoning of the law officer as to the good faith and lack of knowledge on the part of the agent and held that Prosecution Exhibit 3 was admissible in evidence.

We hold that Prosecution Exhibit 3 was not admissible in evidence. Article 31(b), Code, supra, 10 USC § 831, specifically prohibits the interrogation of, or the request for a statement from, an accused or a person *"suspected of an offense without first informing him of the nature of the accusation.'* (Emphasis supplied.) No statement obtained in violation of this Article may be received in evidence against an accused in a trial by court-martial. Article 31(d), Code, supra. United States v Reynolds, supra, is in point. Shortly after Reynolds was determined to be absent without leave, Lieutenant Colonel Parker discovered his automobile was missing from a nearby parking lot. The automobile was later found in Yosemite National Park and the accused was apprehended by civilian police officers in Roosevelt, Utah. A pretrial statement was taken from the accused by Air Police Investigator Carbone who suspected Reynolds of taking Colonel Parker's car but did not so advise him. He contented himself with telling the accused that he was interested in his activities from the time he left the base until his apprehension. In reversing Reynolds' conviction, we stated, at page 405:

"On the face of the record, it is apparent Investigator Carbone did not comply with the terms of Code, supra, Article 31, before interrogating the accused. Thus, he frankly admitted he made no effort to inform Reynolds that he was suspected of taking Colonel Parker's car, although he believed Reynolds to have done so. He further admitted he knew this to be a separate and distinct crime from that into which he was ostensibly inquiring, but considered he sufficiently advised accused by limiting the inquiry to the period of unauthorized absence involved. That such is insufficient to inform accused 'of the nature of the accusation' against him and thereby deprive him of any meaningful choice concerning whether to speak or remain silent is patent."

A careful reading of the *Reynolds* opinion is recommended for, therein, we discussed at length the statutory requirement imposed by the Congress in enacting Article 31, and the nature and scope of the information to be imparted to an accused prior to interrogation. We concluded by holding that:

". . . [O]nce the failure to advise an accused of his rights is es-

tablished, and a subsequent confession's inadmissibility shown, we believe prejudice is demonstrated by its use against him, without regard to the state of the record otherwise. United States v Wilson, . . . [2 USCMA 248, 8 CMR 48 (1953)]; United States v Tanner, . . . [14 USCMA 447, 34 CMR 227 (1964)]; and see Miranda v Arizona, 384 US 436, 16 L Ed 2d 694, 86 S Ct 1602 (1966)." [*Id.*, at page 406.]

The only real difference between this case and *Reynolds* is the fact that in *Reynolds* Investigator Carbone acknowledged that he suspected the accused of the offense of larceny and was thus aware of the legal significance of the facts; while here, Agent Baker, although he believed that Johnson was going to try and contact the enemy, he was, allegedly, unaware of the specific proscriptions of Article 104. He suspected the accused might be defecting but was informed that this was not an offense in the Navy.

The difference is irrelevant. United States v Parish, 17 USCMA 411, 38 CMR 209 (1968). The ▇▇▇▇▇ ▪ plain fact of the matter is that Baker, by his own testimony, believed that the accused was going to try to contact the enemy. It is self-evident that such an unauthorized activity, when it occurs, as here, in or near a theater of combat operations, is obviously illegal. Baker need not have known the precise Article of the Code in order to be obliged to inform the accused he was suspected of an offense other than desertion. It suffices if the accused is made aware of the *general nature of the allegations involved.* United States v Dickenson, 6 USCMA 438, 20 CMR 154 (1955); United States v Davis, 8 USCMA 196, 24 CMR 6 (1957). This simply means that neither this Court nor Congress in enacting Code, supra, Article 31, expected a police officer to use the precision of an attorney or pleader in informing the accused of the subject matter of the interrogation. The statute requires only *"the nature of the accusation"* to be disclosed—not that it "be spelled out with the particularity of a legally sufficient specification." (Emphasis supplied.) United States v Davis, supra, at page 198. Hence, it would have been enough for Agent Baker to have drawn accused's attention to the fact that Baker was aware of the former's intention to contact the enemy, without specific reference to the technical term of holding "intercourse" with the enemy. This is the sort of orientation of which this Court has previously spoken, and such was the meaning of Congress when it enacted Article 31 of the Code. Reversal of the accused's conviction for the offense of attempting, without authority, to hold intercourse with the enemy is required. United States v Reynolds, supra. Cf. United States v Anglin, 18 USCMA 520, 40 CMR 232 (1969). Since the accused's statement, Prosecution Exhibit 3, is the only evidence in the record relating to this offense, Charge II and its specification must be dismissed. Article 67(c), Code, supra, 10 USC § 867.

The question of the admissibility of Prosecution Exhibit 14 (the pretrial statement of the accused to Agent Beattie) presents an entirely different problem. Beattie testified that at the time he interviewed the accused, upon his return from the second unauthorized absence, he was aware that Johnson had previously "been incarcerated in the brig for attempting to have *intercourse with the enemy, and for desertion.*" He knew that a lawyer had been appointed to defend the accused and he acknowledged that he made no attempt to contact the lawyer prior to the interview. He testified that "[i]n as much [sic] as I told him that he could contact his lawyer, and he said that he did not care to, I made no effort to." Defense counsel's objection to the admission in evidence of Prosecution Exhibit 14 was overruled by the law officer without comment.

Paragraph 44*h*, Manual for Courts-Martial, United States, 1969,[3] clearly requires that once counsel has been

---

[3] The Revised edition of the 1969 Manual carries the same provision.

324

appointed, trial counsel may not deal with an accused except through his counsel. In United States v Estep, 19 USCMA 201, 202, 41 CMR 201 (1970), we deemed it unnecessary to decide whether this provision of the Manual applied to criminal investigators as well as to trial counsel, since the record of that trial reflected that Estep was allowed to consult with counsel, at his request, and thereafter executed a pretrial statement against the advice of counsel. However, we stated in *Estep*:

". . . We may assume that when an accused has asserted the right to counsel at a custodial interrogation and the criminal investigator thereafter learns that the accused has obtained counsel for that purpose, he should deal directly with counsel, not the accused, in respect to interrogation, just as trial counsel deals with defense counsel, not the accused, after the charges are referred to trial. See United States v Ross, 19 USCMA 51, 41 CMR 51 [1969]." [*Id.*, at page 202.]

See also United States v Flack, 20 USCMA 201, 43 CMR 41 (1970).

Assuming, as we did in *Estep*, that it was error in this case for Agent Beattie not to inform appointed counsel prior to his interrogation of the accused, we believe that the accused's consent to be interviewed after being informed of his right to contact his lawyer nullified the error.[4] United States v Estep, supra, and cases cited therein at page 203. Cf. United States v Goldman, 18 USCMA 389, 40 CMR 101 (1969). We hold, therefore, that Prosecution Exhibit 14 was properly admitted in evidence.

In passing, however, we note that the requirement that the Government deal through counsel is not burdensome or oppressive, especially where the investigator is on notice that counsel has been appointed or retained.

Once counsel has entered the case, he is in charge of the proceedings and all dealings with the accused should be through him. Paragraph 44*h*, Manual, supra. While we find waiver in this case, the following language in Coughlan v United States, 391 F2d 371, 372 (CA 9th Cir) (1968), cited with approval in *Estep*, is appropriate:

"We, on the other hand, do not want to be considered as lending our approval to the practice, if indeed a practice exists, of interviewing accused persons in jail in the absence of counsel. The better, fairer and safer practice is to afford the defendant's attorney reasonable opportunity to be present. When this is done the heavy burden of proving a waiver of constitutionally protected rights is immeasurably eased."

The decision of the Court of Military Review, insofar as it pertains to the affirmance of the accused's conviction for attempting, without authority, to hold intercourse with the enemy (Charge II), is reversed. The record of trial is returned to the Judge Advocate General of the Navy. In light of the fact that the maximum imposable confinement at hard labor for the remaining offenses is only two years, *vis-a-vis* the twenty-two years maximum which the court could have imposed at trial (the one-year sentence to confinement approved by the convening authority expired July 12, 1970), a rehearing on sentence may be ordered.

QUINN, Chief Judge (concurring in the result):

Apart from my dissent in United States v Reynolds, 16 USCMA 403, 37 CMR 23 (1966), I am not persuaded that it is dispositive of the issue here. Inquiry into the accused's purpose in absenting himself without authority was relevant and material to the desertion charge, as to which he was fully warned. It would appear, therefore, that the happenstance of the rel-

---

[4] Appellate defense counsel, in their brief, concede that the accused answered no when asked by Agent Beattie if he desired to consult with his lawyer.

evance of the statements to another offense would not justify their exclusion from evidence or preclude their use in connection with another charge. I need not, however, decide the point. I am satisfied that the accused's conduct did not pass the stage of preparation to reach that conjunction of act and intention which would reasonably have resulted in commission of the offense. It may be, as the Government contends, and despite the absence of proof of the matter, that in his wanderings the accused was occasionally in the vicinity of enemy forces, but there is no evidence whatever to indicate that he was so "very near to the accomplishment of the act" as to render commission of the crime "probable." Commonwealth v Peaslee, 177 Mass 267, 59 NE 55, 56 (1901). Accordingly, I concur in the dismissal of Charge II and in the disposition of the case as directed in the principal opinion.

DARDEN, Judge (dissenting):

The record in this case supplies enough justification to believe that the appellant's plans to contact representatives of North Vietnam or the Viet Cong sprang from good intentions. My own judgment is that charging him with unauthorized absence would have been enough. But that was not a decision for me to make. Despite my reservation about the compounding of the charge here, the principles of our decisions apply to other cases in which we have no doubts about the extent of the charges. As a result of that recognition, I must express my view that the principal opinion extends the holding in United States v Reynolds, 16 USCMA 403, 37 CMR 23 (1966), beyond the latter's limits.

I do not agree that the difference in this case and *Reynolds* is irrelevant. In *Reynolds*, the interrogator suspected an accused who was absent without leave and who was also connected with the taking of an automobile, but the interrogator warned the accused only that he was interested in the latter's activities since he left his base. In the case now before us, the interrogator testified he did not know that communicating with the enemy is an offense under the Uniform Code of Military Justice. How could the interrogator warn the appellant he was suspected of an offense when the interrogator was unaware that such an offense existed? The word "accusation" as it is used in Article 31(b)[1] of the Code, supra, can take its meaning only in terms of an offense. Hence I do not understand how conduct that is not an offense, at least in the opinion of the interrogator, may be the basis of an accusation. From this it follows that I do not agree with the statement in the principal opinion that "It is self-evident that such an unauthorized activity, when it occurs, as here, in or near a theater of combat operations, is obviously illegal."

Paragraph 44*h* of the Manual for Courts-Martial, United States, 1969 (Revised edition), covers the relations of trial counsel, not investigators, with the accused and his counsel. In this area I adhere to the language of the Court's recent opinion in United States v Flack, 20 USCMA 201, 43 CMR 41 (1970).

---

[1] "No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."